**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
───────────────────────────────────

**MEHUL TRIVEDI,**

                                        **Plaintiff,**

        **v.**                                                          **1:20-cv-609**

**ST. PETER'S HEALTH PARTNERS**
**MEDICAL ASSOCIATES, P.C.,**

                                        **Defendant.**
───────────────────────────────────

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

**I.        INTRODUCTION**

        Plaintiff Mehul Trivedi ("Dr. Trivedi" or "Plaintiff") commenced this employment

discrimination action against Defendant St. Peter's Health Partners Medical Associates,

P.C. (the "P.C." or "Defendant").  The action is brought pursuant to Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII"), the New York

State Human Rights Law, Article 15 §§ 296, *et seq*. ("NYSHRL"), and 42 U.S.C. § 1981

("§ 1981").  *See* Compl. ECF No. 1.  Plaintiff asserts claims of unlawful discrimination

and retaliation based upon his race, color and/or national origin.  *See id.*  Defendant

moves for summary judgment seeking to dismiss the Complaint in its entirety, ECF No.

45, Plaintiff opposes the motion, ECF No. 53, and Defendant files a Reply, ECF No. 56.

For the reasons that follow, the motion is granted.

**II.       STANDARD OF REVIEW**

The parties have evinced their understanding of the well-settled standard for deciding summary judgment motions in Title VII, NYSHRL, and § 1981 discrimination and retaliation actions.  Therefore, this standard will not be repeated.  Suffice it to say that where, as here, the intent of one party is in question but there is no direct evidence of discrimination, the Court must carefully examine the reasonable inferences that could be drawn from the totality of the circumstantial evidence and be cautious about granting summary judgment. *Schiano v. Quality Payroll Sys.,* 445 F.3d 597, 603 (2d Cir. 2006). Nonetheless, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir. 2001); *see Schiano,* 445 F.3d at 603 ("[S]ummary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact.") (quoting *McLee v. Chrysler Corp.,* 109 F.3d 130, 135 (2d Cir.1997)).

## III.    BACKGROUND[1]

### Plaintiff's Medical Practice & Employment by the P.C.

Plaintiff, a bariatric surgeon, was a long-term employee of St. Peter's Hospital ("the Hospital" or "St. Peter's") having been employed for ten (10) years under various iterations of St. Peter's, the last being Defendant St. Peter's Health Partners Medical Associates, P.C. *See* Trivedi  Depo., p. 17.  The P.C. is a multi-specialty physician group with various medical practices operating under its corporate umbrella.  The P.C. employs many physicians, including but not limited to surgeons with differing specialties

---

[1]Where not indicated otherwise, the following facts are taken from Defendant's Statement of Material Facts ("Def. SMF") to which Plaintiff has admitted or failed to supply sufficient opposition. The Court views all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L.Ed.2d 686 (2007).

such as general surgeons, thoracic surgeons, colorectal surgeons and bariatric surgeons. The P.C.'s surgeons see patients in private office locations and also perform surgeries at different hospitals within the Albany area, including at St. Peter's Hospital in Albany, New York, and Samaritan Hospital in Troy, New York.

At all times relevant to the Complaint, Plaintiff was a bariatric surgeon employed by the P.C. In this role, Plaintiff performed surgeries at the Hospital, and also saw patients at a private medical office located in Albany. Plaintiff contends that while he was employed by St. Peter's, he built a busy and successful bariatric practice and won multiple awards in his practice, including Top Doctor, accreditation as a Center of Excellence, and Women's Choice awards. Plaintiff asserts that he built up the practice to include a physician's assistant, an office manager, two medical assistants, and a bariatric program coordinator/nutritionist. Trivedi Depo., p. 22. He further asserts that he requested additional mid-level providers, but he was denied. Trivedi Depo., p. 107.

Here, all physicians who have patients admitted to the Hospital are required to ensure there is coverage for those patients twenty-four hours per day/365 days per year. Plaintiff contends that during his tenue, he requested that the Defendant find him a partner so he had on-call coverage for his hospitalized patients if he was unavailable. Plaintiff maintains that general surgeons could not be on call for his patients because they did not have enough experience in bariatric surgery and their malpractice insurance would not cover this duty. Trivedi Depo., p. 78. Defendant presents evidence indicating that the problems Plaintiff had with finding on-call coverage was due, in large part, because Plaintiff had difficulty getting along with his peers.

For instance, Defendant points out that when Steven Hanks, M.D. ("Dr. Hanks") was first hired into the role of Chief Medical Officer in 2016, the outgoing Chief Medical Officer, Robert Cella, M.D., informed Hanks that Plaintiff had difficulty finding backup on-call coverage because he did not get along with his peers. Hanks Decl. ¶¶ 7-8.   To Dr. Hanks, Plaintiff's difficulty in obtaining backup coverage created potential patient safety concerns. *Id.* ¶ 8.

Plaintiff contends that his ability to get along with his peers was not Dr. Cella's main concern.  Plaintiff indicates that Dr. Cella called a meeting between himself, Plaintiff, and Dr. Hanks in which he expressed no concern about Plaintiff's clinical proficiency and was very supportive of Plaintiff. Trivedi Dec., ¶ 81. Plaintiff contends that the goal during and after Dr. Cella's tenure was to obtain a partner for Plaintiff through a national search, but although a national search was commenced, Dr. Hanks eventually canceled the search. Trivedi Dec., ¶ 82.

The facts indicate the P.C. took steps to hire another surgeon to assist with Plaintiff's caseload. Trivedi Depo., p. 79.  In 2016, Jessica Folek, M.D. ("Dr. Folek"), an endocrinologist who had some bariatric surgery experience, was hired to provide cross-coverage for Plaintiff. *Id.*, pp. 78-79, 81.  But, Plaintiff contends, Dr. Folek, was not a partner because she is not a bariatric surgeon, and Plaintiff further notes that Dr. Folek, who is of Filipino descent, was terminated in less than a year. Trivedi Depo., p. 79-80.

Plaintiff contends that he again requested that a partner be hired, but the search was called off without explanation. Trivedi Depo., p. 80-81. Anna Bauer, Director of Human Resources testified that such a search would be done through a search committee (of which she felt Dr. Trivedi should be a part of as well as their senior

leadership team). There was a separate physician recruitment team for this task. Bauer Depo., p. 65-66.

Plaintiff acknowledges that following his request, a national search was conducted, which included collecting resumes that were eventually narrowed down to two or three candidates. Trivedi Depo., p. 80.  Plaintiff contends that he was hoping to meet these candidates but, before he had that opportunity, the search was called off and he does not know why.  *Id.*, p. 81.  Defendant points out that Plaintiff acknowledged during his deposition that aside from simply asking for a partner, he never took any action to help with this request.  Def. SMF ¶ 107 (citing Trivedi Depo., pp. 83–85). Plaintiff admits  at he "did not have a name to suggest" but contends that "this was why the P.C. had a recruiting department and the plaintiff was involved in reviewing CVs and advising of his interest in two particular candidates." Pl. Resp. SMF ¶ 107 (citing Trivedi Depo., pp. 80–81).  Defendant also contends that Plaintiff admitted at his deposition that he never identified any potential candidates, contacted any other bariatric surgeons, nor did anything other than ask the P.C. to find a partner for him. Def. SMF ¶ 108 (citing Trivedi Depo., pp. 83–85).  Plaintiff again admits that he did not have a name to suggest, but rather contends that he was relying on the P.C.'s recruiting department and was involved in that process by reviewing CVs and advising of his interest in two particular candidates. Pl. Resp. SMF ¶ 108 (citing Trivedi Depo., pp. 80-81).  Plaintiff also notes that while the search for a partner for him was unilaterally canceled, the P.C. hired not only a second bariatric surgeon into Dr. Matthew McDonald's practice, but also hired multiple mid-level providers for Dr. McDonald's practice as well. *Id.* (citing Trivedi Depo., pp. 80-81).

Plaintiff points out that Eric Baier, President of the P.C., acknowledged that Dr. Trivedi was having difficulty with finding backup on-call coverage because general surgeons could not provide backup coverage for a bariatric surgeon. Baier Depo, p. 75. However, Plaintiff also points out, Baier testified that, in his opinion, there was not enough business in Albany to warrant hiring a second physician. Baier Depo., p. 14-15. Plaintiff takes issue with this explanation.

Plaintiff contends that in 2016, Defendant hired another bariatric surgeon, Dr. McDonald, a Caucasian, and placed him in direct competition with Plaintiff in a practice in Troy, mere minutes away from Dr. Trivedi's practice. Trivedi Depo., pp. 28-30. Plaintiff contends that in 2017, Dr. McDonald was provided with almost unlimited resources, including hiring an additional Caucasian doctor, and Dr. McDonald grew his practice to some seventeen (17) employees, as opposed to Dr. Trivedi's seven (7) employees.  Nevertheless, Plaintiff asserts that he consistently had more income and surgeries than Dr. McDonald, despite the fact he had ten (10) less people in his practice.  He further contends that his Albany program had a higher profit/loss then the Troy program for the years 2016, 2017 and 2018, and performed more surgeries than Dr. McDonald.  Defendant points out that while Dr. McDonald's practice was based out of Troy, and he operated at Samaritan Hospital, Plaintiff's practice was based out of Albany and he operated out of St. Peter's Hospital.  Hanks Dec., ¶ 11.

In Fall 2018, a second bariatric surgeon, another Caucasian, Dr. Samuel Hykin, was hired into Dr. McDonald's practice. *See* Baier Depo., p. 12.  Plaintiff points out that Baier claimed Dr. Hykin was hired because it was felt there was enough business to warrant hiring a second bariatric surgeon.  *See* Baier Depo., p. 13. However, Plaintiff

contends, he was performing more procedures at this time, *see* Pl. Ex. 4, even though Dr. McDonald's practice now had three (3) physicians, two (2) bariatric surgeons, and a nutritionist (Dr. Carol Santoro); compared to Dr. Trivedi being solo. Further, Plaintiff contends, Dr. McDonald's program was provided with multiple support staff and mid-level providers whereas he was not. *See* Trivedi Depo., p. 108, Pl. Ex. 4. Moreover, Plaintiff points out that the P.C. marketed Dr. McDonald's program as a comprehensive metabolic care service site even though that program had no awards in contrast to Dr. Trivedi's office.  *See* Baier Depo., p. 51.

Plaintiff asserts that he expressed to Dr. Hanks, on multiple occasions, that he would be willing to collaborate with Dr. McDonald to establish them as peers, but that never materialized. Trivedi Depo., p. 75-71.  Plaintiff points out that the P.C's President, Rik Baier ("Mr. Baier") noted that he was sure that Plaintiff would have been happy to collaborate with Dr. McDonald and to grow the program with him, but that Dr. McDonald informed Baier he did not want to collaborate with Dr. Trivedi or grow the program with him. *See* Baier Depo, p. 63-64.  Plaintiff contends that, while he was still employed, Dr. McDonald never received any repercussions for what Plaintiff deemed to be these breaches of professional and collegial behavior.  Trivedi Depo., p. 108-09.  However, Defendant points out that Dr. McDonald was terminated by the P.C. on May 6, 2021 as a result of concerns regarding his clinical quality and collegiality. Hanks Dec., ¶ 25.

### Oversight of Plaintiff's Employment with Defendant

All general surgeons, thoracic surgeons, bariatric surgeons, and colorectal surgeons employed by the P.C. are managed and overseen by a Joint Operating Committee (the "Surgery JOC"). The Surgery JOC is a management committee

of physicians that oversees the day-to-day administration of the various surgical practices within the P.C. umbrella. Importantly, the Surgery JOC's authority is limited to the surgeons employed by the P.C.; it does not oversee or manage other physicians or practice groups affiliated with the P.C.

Defendant presents evidence that while the Surgery JOC is responsible for day-to-day operations, the surgeons employed by the P.C. are ultimately subject to the oversight of the P.C.'s Board, through its Executive Committee. Def. SMF ¶ 7. Plaintiff admits "that the P.C. is subject to the P.C.'s Board, and further notes, that in [his] experience the Board reviewed termination decisions, not a rubber stamp by the Executive Committee." Pl. Resp. SMF ¶ 7 (citing Trivedi Dec., ¶¶ 20-22, 108). Defendant presents evidence that the Executive Committee makes ultimate decisions with respect to, among other things, terminating physicians employed by the P.C. Def. SMF ¶ 8. Plaintiff denies this contention, again stating that in his experience "the Board reviewed termination decisions, not a rubber stamp by the Executive Committee." Pl. Resp. SMF ¶ 8 (citing Trivedi Dec., at 20-22, 108).

Defendant asserts that from time to time, as appropriate, the Surgery JOC makes recommendations to the President of the P.C. regarding termination of surgeons employed by the P.C. Def. SMF ¶ 9. It further maintains that after such a recommendation is made, the President presents the recommendation to the Executive Committee, which then considers and discusses the Surgery JOC's recommendation and ultimately votes to determine whether to approve the termination. *Id.* ¶ 10. Defendant also asserts that the Surgery JOC is responsible for the general oversight of the P.C.'s surgeons, and the P.C.'s Board, through its Executive Committee, makes the

ultimate decision on whether to terminate a surgeon's employment. *Id.* ¶ 11.  Plaintiff admits these facts with the explanation that in his case in 2017, the Surgery JOC recommended Plaintiff s termination to the Board which rejected the recommendation, and in 2019 recommended Plaintiff's termination to Mr. Baier which ultimately resulted in Plaintiff's termination. Pl. Resp. SMF ¶¶ 10-11 (citing Trivedi Dec.  ¶¶  20-22, 58-65). Thus, Plaintiff contends that in 2019, "the Surgery JOC opted to bypass the Board after Plaintiff was exonerated by the Board in 2017." *Id.* (citing Trivedi Dec., ¶¶ 20-22, 58-65, 108).

### Physician Employment Agreement

At the time Plaintiff' was terminated, he was employed by the P.C. pursuant to a Physician Employment Agreement executed on October 22, 2018, which governed the terms of Plaintiff's employment through his separation. The Agreement set an initial term of two years, unless terminated by either party in accordance with the "Termination" provisions set forth in Section IX.  The Agreement specifically included a "no cause" Termination for Convenience provision, which provided in relevant part: "The Agreement may be terminated for any or no reason by either party on at least 120 days' prior written notice."  The Agreement also provided that it could be terminated in various other ways by the P.C., Plaintiff, or by their mutual agreement.  Finally, the Agreement stated that it "constitutes the entire Agreement between the Parties with respect to the subject matter herein and supersedes all prior agreements, arrangements and/or understandings between the Parties with respect to the subject matter herein."

### Plaintiff's Clinical Skills and Peer Relationships

Defendant presents evidence that throughout Plaintiff's employment, there were multiple documented issues with his clinical skills, patient outcomes and complications, and peer relationships. *See, e.g.*, Declaration of Steven Hanks, M.D., sworn to on December 22, 2022 ("Hanks Dec."), ¶¶ 6–16;  Declaration of Alan Sanders, M.D., sworn to on December 20, 2022 ("Sanders Dec."), ¶¶ 3– 6. As an example of Plaintiff difficulties with peer relationships, Defendant points to Dr. Hanks concern for patient safety due to Plaintiff's inability to obtain on-call coverage when he was unavailable. *See* Hanks Decl. ¶ 7-8.  Plaintiff contends that this was not a legitimate concern because he  provided on-call coverage and denies any inference that he ever failed to provide such coverage. Trivedi Dec., ¶ 15, 111. In fact, he contends, he also provided on-call coverage for general surgery and emergency. *Id.* Plaintiff asserts: "It should be noted that in spite of having no coverage most of my ten years there, I took call 24/7, in addition to emergency room and general surgery call. Most surgeons would not tolerate this. I did this because I loved the solid program that I had built from scratch and felt loyalty to my well over three thousand patients and to St. Peter's. I hoped that at some point they would respond positively to my long-standing request for a partner as my ever-increasing workload and revenue certainly justified this." Trivedi Dec., ¶ 111.

In addition to concerns about Plaintiff's peer relationships, Defendant notes that in 2017, Dr. Santoro, a physician employed by the P.C. who was responsible for treating Hospital patients on total parenteral nutrition ("TPN"), provided Dr. Hanks with a list of ten of Plaintiff's patients who were on TPN. Hanks Decl. ¶ 9.  The number of Plaintiff's patients who required long-term TPN appeared to be excessive. *Id.*

Plaintiff asserts that the number of his patients on TPN was not excessive given that they were bariatric patients who routinely need to be on TPN after surgery, as compared to general surgery patients. Trivedi Dec., ¶ 83.  Plaintiff also asserts that Dr. Santoro, a Caucasian, made the complaint by "cherry-picking" a list of Plaintiff's patients spanning seven years who had required TPN, but by that time Plaintiff had already conducted over 1,500 bariatric operations. *Id.* Therefore, Plaintiff contends, "the actual percentage of my patients requiring TPN was very low, a fact conveniently ignored." *Id.* Plaintiff also contends that "that Dr. Santoro was working with Dr. McDonald's practice and was actively colluding with him." *Id.* ¶ 85.

Plaintiff also contends that prior to Dr. Santoro and Dr. McDonald (who subsequently raised the same concerns) presenting lists of Plaintiff's patients on TPN, his bariatrics program:

> underwent a full review in preparation for accreditation as a Center of Excellence. It was a thorough and comprehensive review. They looked at every aspect of the Program, including Dr. Trivedi's preoperative protocol, his post-operative protocol, and his operative techniques. They also looked at his outcomes across the 1,500 plus bariatric patients. They looked at specific complications and an independent, outside Bariatric Surgeon reviewed the complications in detail between the office and the hospital records. They looked at x-rays, radiology reports, the totality of the situation, and they deemed that the overall mortality and morbidity rate was well below the national noms and standards and that the cases had been managed within the standard of care. [Trivedi Depo., p. 38-39]. This was in addition to a Top Doctor Award that Dr. Trivedi had already received in 2015 [Ex. 6].

Pl. MOL, at 4.

The facts indicate that an internal review of the cases on Dr. Santoro's list was conducted by the Hospital's Department of Surgery. Hanks Decl. ¶ 10. This review was solely internal and not performed by a bariatric surgeon. *Id.*  Plaintiff contends that Dr. Garber, then-Chief of Staff, requested that Dr. Hanks review the cases directly with Dr.

Trivedi. Trivedi Depo., p. 37.  Plaintiff maintains that he responded to all of the

complaints with Dr. Hank and John Taggert, M.D. ("Dr. Taggert"), the Hospital's Chief of

Surgery, with detailed case explanations as to each one of the patients with

explanations of any complications. Trivedi Depo., p. 40-41.  Plaintiff asserts that it was

determined that his complication rate was low, better than national standards, and that

all the identified cases were managed within the standard of care. Trivedi Depo., p. 41.

Plaintiff asserts that both Dr. Taggert and Dr. Hanks expressed that they were satisfied

and determined that there was no need for further action. Trivedi Depo., p. 41-42.

There is no dispute that the review did not lead to any further action relating to Plaintiff's

surgical privileges at the Hospital. Hanks Decl. ¶ 10.

   At some point after this initial review was conducted, Dr. McDonald

independently raised concerns to Dr. Hanks about Plaintiff's patient outcomes. Hanks

Decl. ¶ 11. Dr. McDonald operated at Samaritan Hospital in Troy, and from time to time

would treat patients who were previously treated by Plaintiff.  *Id.*  Dr. McDonald

identified several additional surgical cases that he felt resulted in unacceptable

complications. *Id.*, ¶ 12. It was Dr. McDonald's opinion that Plaintiff's cases should be

reviewed in more detail, and he communicated his concerns to Dr. Hanks. *Id.*, ¶ 12.

   Plaintiff contends that Dr. McDonald simply re-presented the original list

presented by Dr. Santoro with four additional cases. Trivedi Dec., ¶ 85.  He asserts that

Dr. Hanks "conveniently fails to mention that Dr. Santoro was working with Dr.

McDonald's practice and was actively colluding with him in pursuing this matter because

they were not satisfied with the first  review as it was not the outcome they wanted." *Id.*

Plaintiff also asserts that at times he also saw Dr. McDonald's patients and that "most of

these patients either had a bad interaction with him or actually had an adverse outcome due to him." *Id.*

As a result of the complaints relative to Plaintiff's patients, Drs. Hanks and Taggert decided to retain an outside bariatric surgeon to conduct an independent external review of Plaintiff's cases. Hanks Decl., ¶ 13. Plaintiff notes that the selected bariatric surgeon was in the Trinity Health system, of which St. Peter's is a part. Trivedi Decl., ¶ 27.  Plaintiff also contends that, as indicated in the eventual report from the reviewer, the reviewer "spoke to the bariatric surgeon who cared for the patients (namely, Dr. McDonald), but never gave [Plaintiff] the opportunity to speak to the allegations." *Id.* ¶ 28. Thus, Plaintiff contends, the reviewer was not independent. *Id.* Further, Plaintiff contends that the review was flawed and ignored facts well known and verifiable in the surgical literature.  *See id.* ¶¶ 28-30.

In or around June 2018, the external reviewer produced a report regarding the fourteen cases he reviewed. Hanks Dec., ¶ 15. The reviewer's report included multiple critiques of Plaintiff's technique and identified significant issues with Plaintiff's patient outcomes and complications. *Id.*  The reviewer recommended Plaintiff undergo several remedial actions, including observing other bariatric surgeries. *Id.* Plaintiff was provided with a copy of this report, and was offered a chance to respond, which he did. *Id.*, ¶ 16. Plaintiff disagreed with the reviewer's findings. *Id.*  Plaintiff contends that the report contained critiques that were incomplete and false, and he pointed out the discrepancies to Dr. Taggert. Trivedi Decl., ¶ 28-31, Pl. Ex. 9.

Plaintiff also contends that he met with Drs. Hanks, Taggert, Sudeep Ross, Chief Medical Officer of the P.C ("Dr. Ross"), Braziz, and Taylor Chenel on July 11, 2018 to

discuss the review. Trivedi Depo., p. 56; Trivedi Dec. ¶ 32. He contends they agreed that the complication rate was an invalid conclusion, Trivedi Depo., p. 56, and that they expressed that they believed the report was flawed and that no further action would be taken. *Id.* at  p. 57. Plaintiff also contends that Drs. McDonald and Hykin had much higher complication rates than he did, and that he advised someone named Tyler[2] "that the difference between me and them is obviously race" but "in spite of that they were given a pass." *Id.*, p. 148.

In October 2018, one of Plaintiff's post-operative patients passed away at the Hospital. Sanders Decl., ¶ 4. Because there were internal questions about Plaintiff's care of this patient, the Hospital commissioned a second independent external review specifically related to this patient. *Id.* Plaintiff requested a different reviewer because of what he deemed to be the flaws in the first report, but that request was denied and the same reviewer conducted the second review. *See* Trivedi Decl., ¶ 35-37, 96. Like the first external review, the second external review found additional errors with the care and treatment provided by Plaintiff. Sanders Dec., ¶ 5.

Defendant contends that neither Plaintiff's race, color, nor national origin played any role in the Hospital's decision to obtain independent external reviews of Plaintiff's cases. Def. SMF at ¶ 58 (citing  Sanders Dec., ¶ 11; Taggert Dec., ¶ 10; Hanks Dec., ¶ 20). Plaintiff denies this allegation as an improper legal conclusion, and further contends that a reasonable inference can be drawn that Plaintiff's race, color, and/or national

---

[2] Given that the parties have each provided only excerpts from the respective deposition transcripts, it is difficult to determine who this person is or what role the person played in bringing any employment actions against Drs. McDonald and Hykin.

origin played a role in the determination to obtain independent external reviews of Plaintiff's cases.

Defendant presents evidence that the decision to retain the third-party reviewer in both situations was based upon significant patient safety concerns, which, Defendant contends, were ultimately validated by the reviewer's detailed conclusions. Def. SMF ¶ 59 (citing Sanders Dec., ¶ 11; Taggert Dec., ¶ 10; Hanks Dec., ¶ 20). Further, Defendant notes that the independent external physician who performed the reviews is not Caucasian. *Id.* (Citing Hanks Dec., ¶ 20). Plaintiff contends that the reviewer's conclusions were not detailed, but flawed and inaccurate and based upon the reviewer's coordination with Dr. McDonald while refusing to allow Plaintiff to respond before conclusions were made. Pl. Resp. SMF ¶ 59 (citing Trivedi Dec. ¶ 28-31, Pl. Ex. 9).

Following the second external review, the Hospital determined that it needed to take action to address the issues with Plaintiff's skills, outcomes and peer relationships. Sanders Decl., ¶ 6. To that end, Plaintiff was provided with a letter dated January 10, 2019 from the Hospital's Chief Medical Officer, Alan Sanders, M.D. ("Dr. Sanders"), and Chief of Surgery, Dr. Taggert. *Id.*, Ex. A. This letter highlighted the Hospital's significant concerns with Plaintiff's clinical skills as well as concerns regarding Plaintiff's lack of peer relationships and inability to obtain backup call coverage for his patients. *Id.* To address these numerous concerns, the letter provided specific action items that Plaintiff was required to complete to retain surgical privileges at the Hospital. *Id.*

Plaintiff contends that he was presented the letter by Drs. Ross and Sanders. Trivedi Depo., p. 69, Ex. 1. Plaintiff asserts that afterwards, he had a conversation with Dr. Ross wherein Dr. Ross told him he believed the letter was unjust and was "likely due

to discrimination" based on Plaintiff's skin color. Trivedi Depo., pp. 87-88. Dr. Trivedi responded to the letter on February 4, 2019 by email. Ex. 12. Dr. Trivedi began to fulfill the action points that had been requested, including observing another surgeon. Trivedi Depo., p. 97.

After receiving this letter, Plaintiff claims that he asked Dr. Hanks whether his treatment was related to the color of his skin. Complaint, ¶ 65. Dr. Hanks, who played no role in drafting the letter or overseeing Plaintiff's employment, does not recall Plaintiff asking this question, and he did not report the question to anyone at the P.C. Hanks Decl., ¶ 19. Plaintiff points out that Dr. Hanks stated at his deposition that he had a vague recollection that Plaintiff might have raised the issue that the actions taken against him was because of his race, but stated that he did not have a specific recollection of that. Hanks Depo., p. 54. Plaintiff also points out that St. Peter's Health Partners has an EEOC/Non-Discrimination Policy that prohibits discrimination, and states: "Managers are responsible for complying with all aspects of this policy, for investigating and addressing issues in a timely manner and consulting with Human Resources, as necessary" and "[c]olleagues are required to address any matter of concern with their immediate supervisor or a member of the Human Resources Department." Pl. Ex. 13, p. 2. Plaintiff contends that Dr. Hanks did not investigate, address the issue, or consult with Human Resources. Anna Bauer, the Director of Human Resources for the P.C., testified that she first discussed Dr. Trivedi with Dr. Hanks in March 2019, after she contacted him about Dr. Trivedi's complaint to her about Dr. McDonald. Bauer Depo., p. 28.

Defendant points out that the January 10, 2019 letter was not from the P.C., and the conditions stated therein were unrelated to Plaintiff's employment with the P.C. Sanders Dec., ¶ 8. Rather, Defendant contends, the letter addressed Plaintiff's ability to retain surgical privileges at the Hospital. *Id.*, Ex. A. Defendant maintains that this is an important distinction given that Plaintiff was not employed by the Hospital, and neither Dr. Sanders nor Dr. Taggert had authority to take any action related to Plaintiff's employment. *Id.*, ¶ 8. Plaintiff admits that the letter was not signed by an individual from the P.C., and that neither Dr. Sanders or Dr. Taggert could directly terminate his employment. But Plaintiff denies that the letter was unrelated to his employment because it was presented to him by the Chief Medical Officer of the P.C., Dr. Ross, and was then used as a basis for concluding that Plaintiff should be terminated from his employment. Trivedi Dec., ¶ 39. Plaintiff further contends that a loss of privileges would result in his termination under the Employment Agreement.

In response to the January 10, 2019 letter, Plaintiff sent an email to Dr. Sanders and Dr. Taggert dated February 4, 2019. Sanders Dec., ¶ 8, Ex. B. In this email, Plaintiff expressed a willingness to comply with the enumerated action items required to retain surgical privileges at the Hospital. *Id.* Plaintiff's email did not claim that Plaintiff felt he was being treated differently because of his race, color and/or national origin. *Id.* Defendant asserts that Plaintiff testified at his deposition that he intentionally omitted any reference to race or color from the email. Def SMF ¶ 54 (citing Trivedi Depo., p. 94). Plaintiff admits that he did not raise these issues as he was attempting to be "a team player" and had already raised the issues directly with Drs. Hanks and Ross in person, but no action was taken in response to his complaints. Pl. Resp. SMF ¶ 54 (citing

Trivedi Decl., ¶ 40-47). There is no dispute that this email did not claim that Plaintiff felt he was being retaliated against for any reason. Def. SMF ¶ 55.

Defendant also presents evidence that Plaintiff never expressed to either Dr. Sanders or Dr. Taggert that he felt he was being treated differently because of his race, color and/or national origin. Def. SMF ¶ 56 (citing Sanders Dec., ¶ 10; Taggert Dec., ¶ 9). Plaintiff denies this contention, stating that he raised issues with Dr. Taggert that showed that he was being treated differently from Dr. McDonald.  Pl. Resp. SMF ¶ 56 (citing Trivedi Dec., ¶ 32, 86, 88, 104).  However, none of these paragraphs from Plaintiff's declaration specifically indicate that he felt he was being treated differently from Dr. McDonald because of Plaintiff's race, color, and/or national origin.

Defendant also asserts that although the Complaint alleges that Plaintiff sent a letter to Dr. Sanders and Dr. Taggert dated January 18, 2019 alleging that Plaintiff was treated differently because of his race and/or national origin (*see* Complaint, ¶ 64), this letter was drafted by Plaintiff's attorney and never sent. Def. SMF ¶ 57 (citing Sanders Decl., ¶ 12; Tagqert Decl., ¶ 11).  Plaintiff denies this allegation, contending that the letter was sent as an email on February 4, 2019 to Dr. Sanders. Pl. Resp SMF ¶ 57 (citing Pl. Ex. 12).  However, a review of Plaintiff's Exhibit 12 reveals no indication that Plaintiff alleged that he was treated differently because of his race and/or national origin.

On April 26, 2018, Plaintiff wrote an email to Dr. Hanks in which he voiced a concern about "anonymous" physicians questioning his bariatric practice.  Def. SMF ¶ 82. During Plaintiff's deposition, he confirmed that this email was about Dr. McDonald and Dr. Santoro.  *Id*. ¶ 83. According to the email, Plaintiff believed the quality of his

18

practice was excellent and that the anonymous individuals making allegations about his clinical skills were wrong. *Id.* ¶ 84. Plaintiff notes that the email states, in part: "At this time it really appears that this person has selected isolated issues with the objective of targeting me with their malicious agenda. To make matters worse this has become a pattern of behavior and contradicts the 'core values' of St. Peters health partners in every sense. This is wrong morally, ethically, legally or otherwise. This has become a classic case of workplace harassment and bullying." Pl. Ex. 17.  Plaintiff's email did not make any allegation that he felt targeted by Dr. McDonald or Dr. Santoro because of his race, color and/or national origin, or that he was being treated differently because of his race, color or national origin. Def. SMF ¶ 85.  Following Plaintiff's April 26,2018 email, and in response to Plaintiff's concerns, Mr. Baier spoke with Dr. McDonald and instructed him not to publicly discuss Plaintiff's clinical skills. Def. SMF ¶ 87.

In or around March 2019, Plaintiff met with the P.C.'s Human Resources Director, Anna Bauer ("Ms. Bauer"), to discuss his concerns regarding Dr. McDonald. Def. SMF ¶ 88.  During this meeting, Plaintiff voiced his concern about Dr. McDonald continuing to speak negatively about Plaintiff's bariatric practice.  Def. SMF ¶ 89.

After their meeting, Plaintiff followed up in an email to Ms. Bauer dated March 17, 2019.  Def. SMF ¶  90.  Like Plaintiff's April 26, 2018 email to Dr. Hanks, the March 17, 2019 email states Plaintiff's belief that Dr. McDonald and Dr. Dr. Santoro were disparaging his clinical skills.  He also expresses his exasperation that Dr. McDonald's and Dr. Dr. Santoro's conduct and statements were negatively affecting his practice. *See* Pl. Ex 14.[3]  A review of this email reveals no indication that Plaintiff was alleging

---

[3] ("[F]or the last two years and for unclear reasons Dr. McDonald with the help of Dr. Santoro (who tried to remain anonymous) has been engaging in setting an ever-increasing negative narrative on

that he was treated differently because of his race, color, and/or national origin, or that

he felt Dr. McDonald or Dr. Santoro were engaging in any racially motivated conduct.

Defendant contends that Plaintiff never made any complaint based upon race,

color or national origin to Ms. Bauer, at any time. Def. SMF ¶ 93 (citing  Bauer Depo.,

pp. 36-37, 72).  Plaintiff denies this statement of fact by arguing that he "raised

concerns from which discrimination could be inferred, Ms. Bauer limited the

investigation to the narrowest scope possible, and all of the notes of the investigation,

including any notes of this meeting, were lost by the P.C." Pl. Resp. SMF ¶ 93 (citing

Bauer Depo., pp. 23 -24, 64).  Plaintiff contends that he raised concerns from which

discrimination could be inferred because Ms. Bauer was aware that he and Dr.

McDonald were of different races, colors, and national origins. *See* Trivedi Dec., ¶¶ 69-

70.

After meeting with Plaintiff and reviewing his March 17, 2019 email, Ms. Bauer

began an investigation into Plaintiff's concerns. Def. SMF ¶ 94 (citing Bauer Depo., p.

22).  Plaintiff admits this statement but with the explanation that Ms. Bauer claims she

did an investigation but could not produce any documentation of her investigation, and

Plaintiff contends that she never investigated claims of libel and slander by Drs.

McDonald and Santoro.  Pl. Resp. SMF ¶ 94. This last fact, Plaintiff contends, "would

---

my practice, our outcomes, and my professional ability and character. Dr. McDonald has engaged in libel,
slander, and harassment against me. He has conducted this behavior openly and publicly both to staff at
Samaritan Hospital and outside to other employees, medical staff and other physicians. . . . He has
falsely made accusations that we have had a very high rate of surgical complications, that I have 'no idea
what I am doing'; that we have been manipulating our surgical outcomes data base which is impossible to
do even if one desired to. . . . He continues to spread misinformation about our surgical outcomes and
has made statements in the open with sheer glee that 'I am going down' and will be 'fired' soon. He has
gone on to say that he wishes to recruit the Ellis bariatric surgeons to replace me here at St. Peter's. He
has also publicly gloated that I will be made to travel to an outside institution for remedial training. . . .
This has become a classic and clear-cut case of workplace harassment and bullying and is clear to
objective and fair-minded individuals who have witnessed and are aware of the situation.")

have shown that their claims against Dr. Trivedi were specious such that they would not have been relied upon as a reason for his termination." *Id.* (citing Trivedi Dec., ¶ 23-24, 64). Plaintiff contends that he learned of the allegedly narrow scope of Ms. Bauer's investigation through his review of discovery materials. *See* Trivedi Dec., ¶ ¶ 67-68 ("I only learned from the discovery in this pending complaint that Human Resources conducted an investigation only into whether Dr. McDonald was speaking negatively about me in public.  Based on my review of the discovery, the [Human Resources Department's] investigation did not explore whether the allegations against me [by Dr. McDonald] were false, libelous or slanderous and did not address any issues regarding my concerns and my allegations of discrimination or harassment.").

 Ms. Bauer interviewed several witnesses in connection with her investigation, which continued after Plaintiff's Agreement was terminated. Def. SMF ¶ 95.  At the conclusion of her investigation, Ms. Bauer recommended that Dr. McDonald be counseled regarding his behavior. Def. SMF ¶ 96.

Defendant notes that Ms. Bauer played no role in the decision to terminate Plaintiff's agreement and was unaware of who participated in that decision. Def. SMF ¶ 97.  Plaintiff admits this fact but asserts that the Executive Committee was aware that a complaint was pending at the time it "rubber-stamped" the decision to terminate the Plaintiff.  Pl. Resp. SMF ¶ 97.

Defendant also contends that although Plaintiff claims that he was treated differently than Dr. McDonald, Dr. McDonald was ultimately terminated by the P.C. on May 6, 2021. Def. SMF ¶ 98 (citing Hanks Dec., ¶ 25).  Plaintiff admits that Dr. McDonald was ultimately terminated by the P.C., but contends that this was "not until

after Dr. McDonald's Caucasian partner made complaints about his quality of care, disagreeable personality and difficulty to work with." Pl. Resp. SMF ¶ 98.  Defendant asserts that Dr. McDonald's termination was based upon issues with his clinical skills and collegiality. Def. SMF ¶ 99.  Plaintiff admits this fact, but contends that "Dr. McDonald's shortcomings were known to the P.C. during the time he targeted Dr. Trivedi and Dr. Trivedi's concerns were ignored, despite the fact he was a long-term employee with a successful practice. These were the same purported concerns made against Dr. Trivedi, which he demonstrated were false, yet were used as a basis for terminating Dr. Trivedi."  Pl. Resp. SMF ¶ 99 (citing Trivedi Dec., ¶ 71, 94, 110). The cited pages from Plaintiff's declaration indicate that he believed that Dr. McDonald was treated preferentially to him even though, he asserts, it was "well known" that Dr. McDonald had "issues with collegiality and clinical competence." *See* Trivedi Dec., ¶ 71, 94, 110.  But in these paragraphs, Plaintiff does not state the basis upon which Defendant was purportedly aware of these facts.

### The Surgery JOC Recommends Termination of Plaintiff's Agreement, Without Cause, which is Voted on and Approved by the P.C. Executive Committee

Defendant presents evidence that as part of its obligation to oversee surgeons employed by the P.C., the Surgery JOC had several discussions regarding Plaintiff's performance and fit within the practice. In particular, the Surgery JOC discussed issues relating to Plaintiff's clinical competence as well as his difficulty fostering positive peer relationships. Def. SMF ¶¶ 60, 61 (citing Heckman Dec., ¶ 10).  Plaintiff contends that this occurred without notice to him, and the Surgery JOC engaged in "secret discussions" about him and without the benefit of his input. Pl. Resp. SMF ¶ 60 (citing

Trivedi Dec., ¶ 58); *see also* Trivedi Dec., ¶ 109 ("As a member of the JOC, I was entitled to attend these meetings. However, they met in complete secrecy in a process that lacked any transparency or due process.").  Defendant presents evidence that in or around 2018 and early 2019, the Surgery JOC became aware of the external review of Plaintiff's cases referenced above and became aware of Plaintiff's care of a post-operative patient at the Hospital who passed away in late 2018.  The Surgery JOC was also aware of Plaintiff's difficulty in maintaining positive peer relationships and obtaining backup call coverage for his patients. Def. SMF ¶¶ 62-64 (citing Heckman Dec., ¶ 11). Plaintiff denies that he had difficulty maintaining positive peer relationships, and contends that the inability to obtain backup call coverage was solely due to the P.C.'s refusal to provide him with a partner.  Pl. Res. SMF ¶ 64 (citing Trivedi Dec., ¶ 14, 15, 81).

Defendant presents evidence that as a result of the above-mentioned concerns, in early 2019 the Surgery JOC recommended to P.C. President Rik Baier ("Mr. Baier") that the P.C. should move forward with removing Plaintiff from the Surgery JOC and/or terminating Plaintiff's Physician Employment Agreement. Def. SMF ¶ 65 (citing Heckman Dec., ¶ 12). Accordingly, on March 25, 2019, Mr. Baier presented the Surgery JOC's recommendation to the Executive Committee during a regularly scheduled meeting. Def. SMF ¶ 66. Defendant presents evidence that Mr. Baier notified the Executive Committee about the ongoing concerns regarding Plaintiff, including concerns with clinical quality, patient outcomes, and Plaintiff's peer relationships. Def. SMF ¶ 67 (citing Heckman Dec., ¶ 13; Declaration of William Kowal, M.D., sworn to December 21, 2022 ("Kowal Dec."), ¶ 6.).  Based upon the information provided, the Executive

Committee voted to approve the termination of Plaintiff's Agreement. Def. SMF ¶ 68 (citing Kowal Dec., ¶ 7, Ex. B; Heckman Dec., ¶ 13).

Defendant presents evidence that during the March 25, 2019, Executive Committee meeting, the attendees also discussed the fact that Plaintiff had made a complaint to the P.C.'s director of human resources about Dr. McDonald. Def. SMF ¶ 69 (citing Kowal Dec., Ex. B).  Defendant notes that in his internal complaint, Plaintiff claimed that Dr. McDonald had disparaged Plaintiff's clinical skills and bariatric program, but did not complain to Human Resources that he felt he was being treated differently because of his race, color and/or national origin, or that Dr. McDonald's treatment of him was motivated by his race, color and/or national origin. Def. SMF ¶ ¶ 70-71 (citing Kowal Dec., Ex. C).  Defendant presents evidence that Plaintiff's race, color and/or national origin were never discussed at any time by either the Surgery JOC or Executive Committee, and that Plaintiff's complaint to Human Resources about Dr. McDonald – which was entirely unrelated to his race, color, or national origin – did not play any role in the Executive Committee's decision. Def. SMF ¶¶ 73-74 (citing Heckman Dec., ¶ 14; Kowal Dec., ¶ 11).

Plaintiff contends that Mr. Baier went to the Executive Committee "as soon as possible" after the Surgery JOC's decision, and did so without notice to Plaintiff or allowing him to address any concerns addressed by the Surgery JOC.  Thus, he contends, Baier bypassed the Board and allowed the Executive Committee to merely rubber stamp the Surgery JOC's decision.  Plaintiff maintains that while the Executive Committee "may have discussed a truncated version" of Plaintiff's complaint about Dr.

24

McDonald, he believes "it did not encapsulate Plaintiff's full concerns." Pl. Resp. SMF ¶

65-69.  Plaintiff contends :

> I understand that the Executive Committee was aware of my pending
> complaint to Human Resources, but rushed ahead with decision to
> terminate me. I only learned from the discovery in this pending complaint
> that Human Resources conducted an investigation only into whether Dr.
> McDonald was speaking negatively about me in public.  Based on my
> review of the discovery, the [Human Resources Department's] investigation
> did not explore whether the allegations against me [by Dr. McDonald] were
> false, libelous or slanderous and did not address any issues regarding my
> concerns and my allegations of discrimination or harassment. I had raised
> concerns from which discrimination could be inferred. Anna Bauer, the
> Surgery JOC and Executive Committee were all aware of mine [sic] and
> McDonald's race, color, and national origin.  The contrast between the
> manner in which Dr. McDonald was treated versus the manner in which I
> was treated certainly showed a preference to Dr. McDonald, who was only
> recently hired, over me. The only difference was that Dr. McDonald was
> Caucasian, not my same race, skin color or national origin. He was allowed
> a partner, and provided with far more staff than I, despite the fact I had far
> greater volume and a higher profit/loss. I was [sic] consistently had higher
> rates of surgeries than Dr. McDonald. Eric Baier's claim that my practice did
> not warrant a partner is false as my practice had more surgeries than Dr.
> McDonald's practice at the time Dr. McDonald's partner was hired. Further,
> the P.C. undermined my program by advertising the Troy location as the
> premiere location for bariatric surgery, despite the fact Troy had no awards
> and I had Top Doctor, Center of Excellence, and Women's Choice awards. I
> was never told the results of the alleged investigation. I was told I was being
> terminated because I was "not a good fit." A bariatric surgery practice no
> longer exists in Albany as my program could not exist once I was
> terminated. I understand that Dr. McDonald has since been terminated, but
> only after his Caucasian partner made complaints about his clinical skills
> and collegiality, and not because of the protected complaints I lodged.

Trivedi Dec., ¶¶ 66-80.

## IV.    DISCUSSION

### *McDonnell Douglas Corp. v. Green*

Plaintiff's claims of discrimination and retaliation under Title VII, Section 1981,

and the NYSHRL are all subject to the burden-shifting framework set forth in *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 802–03 (1973).  S*ee Johnson v. Andy Frain*

*Servs., Inc.*, 638 Fed. Appx. 68, 70 (2d Cir. 2016) ("Discrimination claims under Title VII[,] . . . § 1981, and the [HRL] are analyzed under the burden-shifting framework in *McDonnell Douglas*."); *Dobbs v. NYU Langone Medical Center*, No. 18-cv-1285, 2021 WL 1177767 (S.D.N.Y. March 29, 2021) ;*Wright v. City of Syracuse*, 611 Fed. App'x. 8, 10 (2d Cir. 2015) ("New York courts require the same standard of proof for claims brought under the NYSHRL as for those brought under Title VII.") (quotations and citations omitted); C*oleman v. Nonni's Foods, LLC*, No. 15 CV 2791 (VB), 2015 WL 8773467, at *5 (S.D.N.Y. Dec. 14, 2015) ("Discrimination claims under the HRL are evaluated under the same standards applicable to claims under Section 1981 and Title VII.").

"To survive a motion for summary judgment, a plaintiff must carry [his] initial burden to establish a prima facie case of discrimination." *Dobbs*, 2021 WL 1177767, *5 (citations omitted). "If the plaintiff satisfies this initial burden, the burden of production (but not persuasion) shifts to the employer to articulate a legitimate, non-discriminatory reason for the action." *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 350 (S.D.N.Y. 2006). If the employer meets this burden, the burden of production shifts back to the plaintiff to demonstrate that the legitimate reasons offered are pretextual. *See id.* "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff, and if the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate." *Id.*

### Prima Facie Case Of Discrimination

To establish a prima facie case of discrimination based upon race, color or national origin, Plaintiff must demonstrate "(1) that he is a member of a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse action took place under circumstances giving rise to an inference of discrimination." *Wright*, 611 Fed. App'x. at 11. A plaintiff's burden at this stage is "minimal." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  Defendant challenges Plaintiff's prima facie case on the third and fourth elements.

**Adverse Employment Action**

"An adverse employment action is a materially adverse change in the terms and conditions of employment ... [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Fairbrother v. Morrison*, 412 F.3d 39, 56 (2d Cir. 2005) (internal quotation marks and citations omitted), *abrogated on other grounds by Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199 (2d Cir. 2006). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (internal quotation marks and citation omitted).

Plaintiff argues that he was subject to several adverse employment actions, including: (1) the P.C.'s decision to hire Dr. McDonald, a Caucasian bariatric surgeon who was purportedly "provided with almost unlimited resources;" (2) the

P.C's decision to end the search for a partner for Plaintiff while allowing a bariatric surgeon to join Dr. McDonald's practice; (3) St. Peter's Hospital's decision to conduct independent reviews of Plaintiff's surgical cases based on the complaints of Drs. Santoro and McDonald, both Caucasians; and (4) the termination of Plaintiff's Agreement. Plaintiff's Memo of Law, pp. 13-14.  The Court finds that only the termination of Plaintiff's Agreement amounts to an adverse employment action.

The P.C.'s decision to hire Dr. McDonald and provide him resources had no impact on Plaintiff's employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (holding that "conduct must be extreme to amount to a change in the terms and conditions of employment"); *Islamic Society of Fire Dept. Personnel v. City of New York*, 205 F. Supp.2d 75, 85 (E.D.N.Y. 2002)("[C]ourts in this circuit have universally rejected attempts by plaintiffs to show an adverse employment action based simply on the plaintiff's personal feelings about the employer's actions." )(collecting cases).

The same conclusion is reached as to the P.C's decision to end the search for a partner for Plaintiff. As Defendant points out, the P.C. hired Dr. Folek and the fact that the P.C. did not thereafter provide a partner was not a material change in the terms or conditions of Plaintiff's employment. Plaintiff does not claim that he was entitled to a partner under any contract or other obligation. Rather, Plaintiff claims that he asked for something that he thought would be helpful, and that the P.C. failed to provide what he asked for.  Again, Plaintiff's personal feelings about the P.C.'s action or alleged inaction do not constitute an adverse employment action. *Islamic Society*, 205 F. Supp.2d at 85. (citations omitted). Further, Plaintiff asserts that he provided his own on-call coverage,

denies any inference that he ever failed to provide such coverage, and contends he also provided on-call coverage for general surgery and emergency.  Trivedi Dec., ¶ 15, 111.

Finally, Plaintiff argues that the Hospital's two independent reviews of his surgical cases were "analogous to reprimands as they drew negative conclusions." Plaintiff's Memo of Law, p. 14.  "Reprimands or negative evaluation letters may, in some circumstances, constitute adverse employment action ... and whether they do is typically a question of fact for the jury[.]" *Lawrence v. Mehlman*, 389 F. App'x 54, 56 (2d Cir. 2010) (internal quotation marks and citations omitted).  Here, the Hospital's two independent reviews do not amount to adverse employment actions.  First, the independent reviews were arranged for by the Hospital, not the P.C.  Second, the conclusions of an independent, third-party reviewer do not constitute a reprimand of Plaintiff by the P.C.  Third, neither the P.C. nor the Hospital had any control over the reviewer's findings. Fourth, even if the P.C. had conducted the review and criticized Plaintiff's performance, it is well established that "an employer's excessive scrutiny of an employee, without more, fails to satisfy the requirements for an adverse employment action." *Colton v. New York Division of State Police*, No. 5:14-cv-00801, 2017 WL 5508911, *16 (N.D.N.Y. Feb. 8, 2017) (quotations and citations omitted).

**An Inference of Discrimination**

In opposition to the P.C.'s motion, Plaintiff argues that the termination of his Agreement occurred under circumstances giving rise to an inference of discrimination because: (1) he was treated differently than Dr. McDonald; (2) the manner in which the P.C. decided to terminate his Agreement was improper;  (3) the P.C.'s alleged

spoliation of evidence raises an inference of discrimination; and (4) Dr. McDonald's and/or Dr. Santoro's alleged discriminatory motivation played a meaningful role in the decision to terminate Plaintiff's Agreement, and therefore Defendant is liable under a "cat's paw" theory. The Court will address each of these in turn.

In the absence of direct evidence of discriminatory intent, a plaintiff may "raise an inference of discrimination by demonstrating the disparate treatment of similarly situated employees." *Kosack v. Entergy Enters., Inc.*, No. 14-CV-9605, 2019 WL 330870, *6 (S.D.N.Y. Jan. 25, 2019). "But in order to do so, the plaintiff 'must show []he was similarly situated in all material respects to the individuals with whom []he seeks to compare [himself].'" *Cooper v. Templeton*, 629 F. Supp. 3d 223, 230–31 (S.D.N.Y. 2022), *aff'd sub nom. Cooper v. Franklin Templeton Invs.*, No. 22-2763-CV, 2023 WL 3882977 (2d Cir. June 8, 2023)(quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotations omitted), and citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) ("To be 'similarly situated,' the individuals with whom [a plaintiff] attempts to compare herself must be similarly situated in all material respects.")). Employees are similarly situated if they are "'(1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct.'" *Wood v. New York Transit Authority*, 699 Fed. Appx. 76, 78 (2d Cir. 2017) (quoting *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493-94 (2d Cir. 2010)). "In addition to identifying similarly situated employees who are subject to the same performance evaluation and discipline standards, a plaintiff must also show that those employees engaged in acts of comparable seriousness but were not punished as severely as plaintiff." *Risco v. McHugh*, 868 F.Supp.2d 75, 100 (S.D.N.Y. June 14, 2012).

Plaintiff contends that he was terminated "while Dr. McDonald was only counseled, despite both were accused of the same purported issues." Pl. Mem. L. at 29. Plaintiff misconstrues the facts which indicate that Dr. McDonald was counseled after Ms. Bauer's investigation into Plaintiff's complaint that McDonald was bullying and disparaging him.  By contrast, the facts indicate that the P.C. Executive Committee approved the termination of Plaintiff's Agreement due to significant concerns regarding Plaintiff's clinical skills, patient outcomes and complications, as well as Plaintiff's lack of peer relationships.  Plaintiff has submitted insufficient evidence to establish that Dr. McDonald was subject to the same quality and/or peer relationship concerns at the time the decision was made to terminate Plaintiff's Agreement.  While Plaintiff has pointed to evidence indicating that he told someone named Tyler that Dr. McDonald  had a much higher complication rate than Plaintiff, he does not indicate whether Tyler was in a position to discipline Dr. McDonald for this conduct, or even that an investigation was conducted into Dr. McDonald's conduct at the time the decision was made to terminate Plaintiff.  Rather, the evidence indicates that Plaintiff had been the subject of multiple reviews, including an internal review and two independent external reviews in the year preceding his termination, which revealed significant concerns with Plaintiff's technique, patient outcomes and complications.

There is insufficient evidence that Dr. McDonald was subject to the same reviews or concerns by the Surgery JOC, the Executive Committee, or the P.C. at the time the decision was made to terminate Plaintiff's Agreement.  While Plaintiff contends that he complained to Dr. Hanks and Ms. Bauer about Dr. McDonald, those complaints appeared to be concerned with McDonald's treatment of Plaintiff-not about McDonald's

clinical quality. Plaintiff's personal dispute with Dr. McDonald does not raise an inference of discrimination by the P.C. *Cf. Neratko v. Frank*, 31 F. Supp. 2d 270, 284 (W.D.N.Y. 1998)("'Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place. Personal animosity is not the equivalent of sex discrimination and is not proscribed by Title VII. The plaintiff cannot turn a personal feud into a sex discrimination case by accusation.'")(quoting *McCollum v. Bolger,* 794 F.2d 602, 609–10 (11th Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S. Ct. 883, 93 L.Ed.2d 836 (1987)(internal citations omitted)).

Further, even if Dr. McDonald was similarly situated to Plaintiff, Plaintiff's claim that he was treated differently than Dr. McDonald is without merit. Dr.  McDonald was terminated by the P.C. on May 6, 2021 as a result of concerns regarding his clinical quality and collegiality.  Accordingly, even assuming Dr. McDonald was subject to the same clinical criticisms as Plaintiff, and assuming Dr. McDonald had similar issues with peer relationships, the P.C. did not treat him any differently than Plaintiff.  Both physicians' contracts were terminated. In the end, the P.C.'s treatment of Dr. McDonald does not raise an inference of discrimination.

Plaintiff claims that discriminatory motivation can be inferred from the fact that the P.C. did not offer Plaintiff an opportunity to refute the reports or conclusions of the independent outside reviewer, and "rushed" to terminate his Agreement. These reasons are insufficient to create a material question of fact as to whether his termination occurred under circumstances giving rise to an inference of discrimination.  Plaintiff does not claim that the Surgery JOC was motivated by any discriminatory animus when it first recommended the termination of his agreement in 2017, and he appears to rely

on speculation that the Surgery JOC's second recommendation to terminate his Agreement, less than two years later and after more troubling issues with Plaintiff's performance came to light, was motivated by discriminatory animus.  This, by itself, is insufficient to establish an inference of discrimination.

Further, Plaintiff has not alleged that the Surgery JOC, Board, or P.C. Executive Committee were required by any contract, rule, or policy to provide him with an opportunity to refute the findings of the independent third-party reviewer.  Moreover, as explained in the Declarations of Jason Heckman, M.D. and William Kowal, M.D.,  the Surgery JOC and P.C. Executive Committee followed a permissible process. *See* Heckman Dec., ¶¶ 2-14; Kowal Dec., ¶¶ 6–11.  The evidence indicates that the Surgery JOC was legitimately concerned about Plaintiff's skills, patient outcomes, patient safety, and collegiality. *Id.* The evidence also indicates that those concerns were raised through the appropriate channels – to the President of the P.C. – and then discussed during a meeting of the Executive Committee. *Id.*  The unrefuted evidence indicates that based upon the information presented, the Executive Committee voted to terminate Plaintiff's Agreement. *Id.*  Plaintiff does not dispute, except by speculation, the sworn testimony from Dr. Heckman and Dr. Kowal that the Surgery JOC and Executive Committee never discussed Plaintiff's race, color or national origin at any time. *Id*. Thus, as Defendant contends, there is no evidence that the process followed by the Surgery JOC or Executive Committee was flawed or inappropriate, and Plaintiff's attempt to point to an inference of discrimination based upon the process utilized is insufficient.

Plaintiff also asks the Court to infer discriminatory motivation based upon a spoliation argument. Plaintiff claims that because the notes from Ms. Bauer's

investigation into Plaintiff's complaint about Dr. McDonald are not available, the Court should infer that the P.C.'s decision to terminate his Agreement was racially motivated. The argument is without merit.

"Before a court may sanction a party for spoliation of evidence, the moving party must show that (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the party having control over the evidence acted with a culpable state of mind; and (3) the missing evidence is relevant to the moving party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Gaffield v. Wal-Mart Stores East, LP*, 616 F.Supp.2d 329, 337 (N.D.N.Y. Mar. 31, 2009) (quoting *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

Here, the missing documents have little bearing on Plaintiff's claims in this case. Plaintiff's verbal statements to Ms. Bauer, as well as his written complaint on March 17, 2019, do not allege that he was being treated differently because of his race, color or national origin, and did not claim that Dr. McDonald was motivated by any discriminatory animus in raising concerns about Plaintiff's clinical skills. *See* Kowal Dec., Ex. C; Bauer Depo., p. 72. As such, Ms. Bauer was not investigating a race discrimination complaint, and it appears that Plaintiff's race was wholly unrelated to the interviews she conducted or her ultimate conclusion. *Id.* Further, Ms. Bauer was able to provide testimony regarding her conclusion that Dr. McDonald had made comments about Plaintiff's clinical skills, and she was also able to recall that she recommended that Dr. McDonald receive formal counseling to address this issue. Bauer Depo., pp. 33-34. Moreover, Plaintiff indicates that he was aware of the scope of Ms. Bauer's

investigation based upon the discovery he received in this case. *See* Trivedi Dec., ¶¶ 67-68.

The case cited by Plaintiff, *Sanders v. The Univ. of Idaho*, No. 3:19-cv-00225, 2022 WL 6160165 (D. Idaho Oct. 7, 2022), fails to support his argument on spoliation. There, the investigation in question was conducted to address multiple complaints of gender bias and sex discrimination. *See id.* at 939. The employer in that case was aware of the potential for litigation before the investigation was started. *See id*. at 941-942. As such, the employer's duty to preserve began before the investigation began. *Id.* Here, by contrast, Ms. Bauer's investigation was unrelated to race, color, and/or national origin discrimination.

Further, even assuming the interview notes showed some individuals believed that race, color, or national origin was behind Dr. McDonald's complaints about Plaintiff, the evidence here shows that the Surgery JOC's decision was based on the external reviewer's conclusions. And, the evidence is essentially undisputed - save Plaintiff's speculation - that the Surgery JOC and the Executive Committee did not consider Plaintiff's race, color, or national origin in making their decisions.

Finally, even assuming that Plaintiff is entitled to a spoliation finding regarding Ms. Bauer's interview notes, for the reasons discussed below Plaintiff is unable to meet his ultimate burden to demonstrate that the employer's proffered legitimate nondiscriminatory reason for his discharge was a pretext for unlawful discrimination.

At several points in Plaintiff's opposition, he refers to the "cat's paw" theory to establish an inference of discrimination. Plaintiff argues that Dr. McDonald's and/or Dr. Santoro's alleged discriminatory motivation played a meaningful role in the decision to

terminate Plaintiff's Agreement. *Id.,* p. 27.  This argument fails to rise to an inference that discrimination motivated Defendant's decision to termination Plaintiff's Agreement.

Some courts "have held that 'an employer cannot shield itself from liability ... by using a purportedly independent person or committee as the decisionmaker where th[at] decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design.'" *Nagle v. Marron*, 663 F.3d 100, 117 (2d Cir. 2011) (quoting *Dedmon v. Staley,* 315 F.3d 948, 949 n. 2 (8th Cir. 2003)).  "Under this so-called 'cat's paw' theory, a final decisionmaker that relies entirely on an improperly motivated recommendation from a subordinate may render the [employer] liable because the subordinate, although not formally delegated the power to make decisions, acts as the [employer's] agent." *Id.*[4]

Here, there is no evidence in the record that Dr. McDonald or Dr. Santoro were motivated by discriminatory animus toward Plaintiff.  Plaintiff does not allege that either physician made any race-related comments at any time. Plaintiff's Depo., p. 118. During his deposition, Plaintiff stated that he thought Dr. McDonald and Dr. Santoro were motivated by race because he was a very good doctor and there was no other possible explanation for why they would be critical of his work. *Id.*, pp. 118–119, 39–40.  Aside

---

[4] The Second Circuit stated in a footnote in *Nagel:*

The term "cat's paw" is apparently drawn from a La Fontaine poem (perhaps itself drawn from an Aesop fable) about a monkey who convinces a cat to get chestnuts roasting in a fire. As the cat pushes the chestnuts out one by one, the monkey eats them; the monkey gets the chestnuts while the cat gets only burnt paws. *See Staub v. Proctor Hosp.,* —— U.S. ——, 131 S.Ct. 1186, 1190 n. 1, 179 L.Ed.2d 144 (2011). "'Today the term 'cat's paw' refers to one used by another to accomplish his purposes.'" *Arendale v. City of Memphis,* 519 F.3d 587, 604 n. 13 (6th Cir.2008) (quoting *EEOC v. BCI Coca–Cola Bottling Co.,* 450 F.3d 476, 484 (10th Cir.2006)).

663 F.3d at 117, n. 15.

from Plaintiff's unsubstantiated speculation, Plaintiff does not point to any evidence that implies that Dr. McDonald or Dr. Santoro were motivated by discriminatory animus.

Further, Dr. McDonald's and/or Dr. Santoro's opinions regarding Plaintiff's skills did not play any meaningful role in the decision to terminate Plaintiff's Agreement.  As Defendant argues, the Hospital did not rely on Dr. McDonald's and/or Dr. Santoro's alleged criticisms of Plaintiff. Instead, it hired an outside bariatric surgeon to conduct a review of Plaintiff's cases.  Moreover, Plaintiff fails to present evidence that the Surgery JOC or P.C. Executive Committee considered Dr. McDonald's and/or Dr. Santoro's critiques of Plaintiff's skills at any time when making the decision to terminate Plaintiff's Agreement. Rather, as Defendant contends, they were aware of the negative outside reviews and the death of Plaintiff's patient in in October 2018.

### Conclusion: Prima Facie Case Of Discrimination

Even when considering the totality of the facts in the light most favorable to Plaintiff, and drawing reasonable inferences on his behalf, he has failed to present a prima facie case of discrimination.

### Prima Facie Case Of Retaliation

To establish a prima facie case of retaliation under Title VII, Section 1981 and the NYSHRL, Plaintiff must establish that: (1) he engaged in protected activity; (2) his employer was aware of the protected activity; (3) he suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse action. *Kelly v. Howard I. Shapiro & Assocs*., 716 F.3d 10, 14 (2d Cir. 2013); *see also Santos v. Costco Wholesale, Inc.*, 271 F. Supp. 2d 565, 574 (S.D.N.Y. 2003) (the elements required to state a retaliation claim under Section 1981 "are the same as

those required to make out such a claim under Title VII."). In addition, Plaintiff must establish that his protected activity was the "but for" cause of his termination. *Dobbs*, 2021 WL 1177767, at *6 (citations omitted).

Defendant argues that Plaintiff cannot establish a prima facie case of retaliation because: (a) he cannot establish that he engaged in protected activity that his employer was aware of; and (b) there is no causal connection between Plaintiff's alleged protected activity and his termination. Plaintiff contends that he engaged in protected activity (1) when he said to Dr. Hanks in January 2019 that he felt that the January 10, 2019 letter he received was about his skin color; (2) when he met with Dr. Ross and they discussed that the January 10, 2019 letter was because of Dr. Trivedi's skin color; and (3) when he reported that he had been undergoing workplace harassment and bullying for two years. Plaintiff also contends that there was a causal connection between his protected activity and the termination of his Agreement.  The Court will address these issues in turn.

### Employer Aware of the Protected Activity

On the second element of the prima facie case, Plaintiff must establish that the employer was aware of her protected activity.  "To constitute 'protected activity,' a plaintiff's complaint must include 'sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race ... or any other characteristic protected by" a relevant statute. *Morales v. Bottling Grp., LLC*, 374 F. Supp. 3d 257, 274 (W.D.N.Y. 2019), *aff'd sub nom. Campbell v. Bottling Grp., LLC*, 814 F. App'x 630 (2d Cir. 2020)(quoting *Lehman v. Bergmann Assocs., Inc.*, 11 F.Supp.3d 408, 417-18 (W.D.N.Y. 2014) (citation omitted)). "'The onus

is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally.'" *Id.* (quoting *Hanfland v. Brennan*, 2015 WL 6134177, *11 (W.D.N.Y. 2015) (citation omitted)); *see McKenzie v. Big Apple Training Inc.*, No. 1:22-CV-9554-GHW, 2023 WL 4866041, at *9 (S.D.N.Y. July 31, 2023)("'Mere complaints of unfair treatment are not protected speech in the employment retaliation context,' and it is the speaker's responsibility 'to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally.'")(quoting *Benzinger v. Lukoil Pan Ams.*, LLC, 447 F. Supp. 3d 99, 124 (S.D.N.Y. 2020) (quotation and ellipsis omitted)); *Chauhan v. MM Hotel Mgmt. LLC*, No. 18 CV 5963, 2019 WL 6118006, at *9 (E.D.N.Y. Nov. 18, 2019)("To qualify as protected activity, a plaintiff must clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally.") (quoting *Sletten v. LiquidHub, Inc.*, No. 13 Civ. 1146, 2014 WL 3388866, at *5 (S.D.N.Y. July 10, 2014)) (internal quotations and citations omitted); *Hanfland v. Brennan*, 2015 WL 6134177, *11 (W.D.N.Y. 2015) (citation omitted) ("The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally.").

"[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited" by a particular statute. *Jackson v. Syracuse Newspapers,* No. 10-CV-1362 (NAM), 2013 WL 5423711, at *20

(N.D.N.Y. Sept. 26, 2013) (citation omitted). "[G]eneralized complaints of unfair treatment do not qualify as a protected activity." *Eckhart v. Fox News Network, LLC*, No. 20-CV-5593 (RA), 2021 WL 4124616, at *20 (S.D.N.Y. Sept. 9, 2021) (internal quotation marks and citation omitted). Similarly, "'ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity.'" *McKenzie*, 2023 WL 4866041, at *9 (quoting *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (citations omitted), and citing *Venezia v. Luxotica Retail N. Am. Inc.*, No. 13-cv-4467 (RJS), 2015 WL 5692146, at *12 (S.D.N.Y. Sept. 28, 2015)).

Regarding Plaintiff's statement to Dr. Hanks, Plaintiff concedes that although the policy in effect at the time required managers and colleagues to either investigate or report claims of unlawful discrimination, Dr. Hanks did neither. *See* Pl. Mem. L. at 21. Thus, Plaintiff fails to establish that the P.C. was aware of his complaint to Dr. Hanks.

Regarding Plaintiff's conversation with Dr. Ross, Plaintiff concedes that the concerns related to the January 10, 2019 letter were not reported to the Human Resources Department. *See* Pl. Mem. L. at 22. This, by itself, does not necessarily mean that the P.C. was not aware of Plaintiff's complaint because Dr. Ross was the Chief Medical Officer for the P.C. in early 2019. However, as Defendant points out, Dr. Ross's purported statement that he believed the content of the January 10, 2019 letter was due to Plaintiff's skin color is inadmissible hearsay which is insufficient to oppose summary judgment. *See Lawrence v. Mehlman*, 389 Fed. Appx. 54, 56 n. 2 (2d Cir. 2010)("In his brief, Lawrence also cites his own deposition testimony that 'there was a discussion in the group' during which other doctors expressed their view that Lawrence

received worse shift assignments because of his race.  . . .   In reviewing the district court's award of summary judgment, Lawrence's hearsay account of doctors' statements of opinion is not admissible in evidence.")(citing Fed .R. Civ. P. 56(e)(1); Fed. R. Evid. 802)).   Furthermore, even if the alleged statement is admissible, Plaintiff does not identify why Dr. Ross allegedly felt this way, or the basis for the alleged statement.  Finally, Plaintiff presents insufficient evidence upon which a reasonable factfinder could conclude that the Surgery JOC or the Executive Committee considered Plaintiff's complaint to Dr. Ross, or any other evidence that Plaintiff had been discriminated against on the basis of a protected classification, when they determined to terminate Plaintiff's employment.

Regarding Plaintiff's reports about enduring two years of workplace harassment and bullying, he points to his email complaints to Dr. Hanks on April 26, 2018, and to Ms. Bauer on March 17, 2019.  As stated above, Plaintiff's April 26, 2018 email to Dr. Hanks in which he voiced a concern about "anonymous" physicians (who Plaintiff later identified as Drs. McDonald and Santoro) questioning his bariatric practice did not mention any allegation that he felt the physicians were targeting him because of his race, color and/or national origin, or that he was being treated differently because of these characteristics. Thus, this email does not constitute protected activity.  *See, e.g., Bain v. Wal-Mart Stores, Inc.*, 585 F. Supp.2d 449, 453 (W.D.N.Y. Nov. 12, 2008) ("In order for an employee's complaints to be a 'protected activity' they must relate to an alleged violation of Title VII, i.e., the complaints must relate to race or gender. Otherwise, any employee who is disgruntled or dissatisfied with any aspect of his or her

employment would ultimately find relief in Title VII even when race or gender was not an issue.")(citations and quotations omitted).

Furthermore, the use of the words "bullying" and "harassment" in this email does not make it protected activity because the underlying complaint was not related to race, color, or national origin. *See, e.g., Malone v. Town of Clarkstown,* No. 19 CV 5503 (VB), 2022 WL 2834105, at *8 (S.D.N.Y. July 20, 2022) ("Similarly, plaintiff's complaints about harassing conduct . . . are not protected activity because they complain of general bullying and harassment that plaintiff does not claim are linked to or motivated by her sex."); *Johnson v. City Univ. of New York*, 48 F. Supp. 3d 572, 577 (S.D.N.Y. 2014) (plaintiff's "complaints about his boss's bullying and harassment" did not constitute protected activity where there was no allegation that the complained of treatment was because of plaintiff's membership in a protected class); *cf. Lynch v. Nat'l Fuel Gas Distribution Corp.*, 25 F. Supp. 3d 358, 367 (W.D.N.Y. 2014) ("plaintiff has produced no evidence of any complaint, formal or informal, sufficient to have placed [employer] on notice that by complaining about [supervisor]'s 'bullying' she was referring to discriminatory activity").  Finally, as indicated above, Plaintiff concedes that Dr. Hanks never conveyed Plaintiff's complaint to the P.C.

Turning to Plaintiff's March 17, 2019 email to Ms. Bauer, this email did not allege that he was being treated differently because of his race, color, or national origin, and did not claim that Dr. McDonald was motivated by any discriminatory animus in raising concerns about Plaintiff's clinical skills. Thus, even though members of the Surgery JOC and the Executive Committee were aware of Plaintiff's complaint to Ms. Bauer, there was no reason for them to conclude that that Plaintiff had complained about race, color

or national origin discrimination. Indeed, other than Plaintiff's speculation, it is not refuted that Plaintiff's race, color and/or national origin were never discussed at any time by either the Surgery JOC or Executive Committee, or that Plaintiff's complaint to Human Resources about Dr. McDonald – which was unrelated to his race, color, or national origin – played any role in the Executive Committee's decision.

### Causal Connection

To establish a causal connection between Plaintiff's alleged protected activity and the P.C.'s decision to terminate his agreement, Plaintiff points to (1) the timing of his termination; and (2) the fact that the Executive Committee knew the P.C.'s Human Resources department was investigating Plaintiff's complaint about Dr. McDonald when it voted to terminate his Agreement. As Defendant argues, neither of these arguments establishes that any alleged protected activity was the "but for" cause of Plaintiff's termination. *See University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 360 (2013).

It is well-settled that temporal proximity alone is insufficient to overcome an employer's legitimate, nondiscriminatory reason for terminating a plaintiff's employment." *Bain*, 585 F. Supp.2d at 454. The P.C. has articulated a legitimate, non-retaliatory basis for Plaintiff's termination, namely, Plaintiff's poor clinical skills and lack of peer relationships. Thus, even if Plaintiff made the alleged statement to Dr. Hanks, the timing of the statement in relation to the termination decision is insufficient to create a question of fact, particularly where the Surgery JOC and Executive Committee were not aware of Plaintiff's alleged statement to Dr. Hanks.

The fact that the Executive Committee knew that there was an investigation into Plaintiff's March 17, 2019 email complaint does not support Plaintiff's retaliation claim. As discussed above, Plaintiff's March 17, 2019 complaint was unrelated to race, color or national origin. Rather, the complaint addressed Plaintiff's concerns that Dr. McDonald was making derogatory statements about Plaintiff's clinical skills. The Executive Committee's knowledge of this investigation does support the conclusion that the Executive Committee was motivated by retaliatory animus when it voted to terminate Plaintiff's Agreement.

Further, as also discussed above, Plaintiff does not sufficiently refute that the Surgery JOC and P.C. Executive never discussed or had knowledge of any claim by Plaintiff that he was being treated differently because of his race, color and/or national origin at any time.  *See* Kowal Dec., ¶ 10–11; Heckman Dec., ¶ 14.  Plaintiff cannot rely on conclusory assertions of retaliatory motive to satisfy the causal link.  *See Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004) (noting "that a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link . . . Instead, he must produce some tangible proof to demonstrate that his version of what occurred was not imaginary.")(quotations and citations omitted). Under the circumstances, even if Plaintiff engaged in protected activity as alleged, there is insufficient evidence that his activity was a "but for" cause of the decision to terminate Plaintiff's Agreement.

### Conclusion: Prima Facie Case Of Retaliation

Even when considering the totality of the facts in the light most favorable to Plaintiff, and drawing reasonable inferences on his behalf, he has failed to present a prima facie case of retaliation.

44

**Pretext**

As stated above, the P.C. has articulated a legitimate, non-retaliatory basis for Plaintiff's termination, namely, Plaintiff's poor clinical skills and lack of peer relationships. Even assuming *arguendo* that Plaintiff has established a prima facie case of discrimination or retaliation, he fails to satisfy his ultimate burden of proving that the P.C.'s stated reasons for his termination were pretextual.

Courts in this Circuit have explained that "a reason [for termination] cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Isaac v. City of New York*, 701 F. Supp. 2d 477, 488 (S.D.N.Y. 2010) (quotations and citations omitted). "The burden of establishing pretext is a higher burden than that required to establish the prima facie case," and the Second Circuit has instructed that a plaintiff's initial allegations of discrimination "must be 'increasingly sharpened and focused' at this stage." *Id*. at 488 (quoting *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.1985) (affirming summary judgment in favor of defendant)). Although the "trier of fact may still consider the evidence establishing plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual," *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142–43, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Burdine*, 450 U.S. at 255 n. 10), "[t]o get to the jury, '[i]t is not enough ... to disbelieve the employer; the fact finder must [also] believe the plaintiff's explanation of intentional discrimination.'" *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir. 2000)(quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)). "The plaintiff's opportunity to demonstrate that the employer's proffered reason was false now merges

with [his] ultimate burden to persuade the trier of fact that [he] has been the victim of intentional discrimination (i.e., that an illegal discriminatory reason played a motivating role in the adverse employment decision)." *Bickerstaff v. Vassar College*, 196 F.3d 435, 446–47 (2d Cir.1999) (citations omitted); *see also Reeves*, 530 U.S. at 142–43 (Plaintiff bears the burden of demonstrating that the defendant's reasons are a pretext for a racial motivation for its actions).

As Defendant argues, Plaintiff appears to claim that the P.C.'s stated reasons for terminating the Agreement were pretextual because the concerns articulated by Dr. McDonald, Dr. Santoro, Dr. Hanks, Dr. Sanders, Dr. Taggert, and the independent bariatric surgeon who reviewed his cases, were wrong.  Plaintiff's argument misses the mark for purposes of a pretext analysis because it is immaterial whether the P.C. was correct in its conclusion that Plaintiff had significant issues with technique, patient outcomes and peer relationships. *See Dobbs*, 2021 WL 1177767, at *7 ("Third, and most important, it does not matter if Defendant was correct in its conclusion that Plaintiff took the money. It matters only that Defendant's conclusion that Plaintiff took the money, rather than unlawful discrimination, was the reason for her termination.")(citing *Toussaint v. NY Dialysis Servs.*, 706 F. App'x 44, 45-46 (2d Cir. 2017) (courts are "not interested in the truth of the allegations against [the] plaintiff" but rather "in what motivated the employer"); *Borzon v. Green*, 778 F. App'x 16, 19 (2d Cir. 2019) (a court is not "'a super-personnel department that reexamines an entity's business decisions'")(quoting *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014)); *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp.2d 98, 111 (S.D.N.Y. 2009) ("Where a plaintiff has been terminated for misconduct, the question is not 'whether the

46

employer reached a correct conclusion in attributing fault [to the plaintiff] ..., but whether the employer made a good-faith business determination.'")(quoting *Baur v. Rosenberg, Minc, Falkoff & Wolff,* No. 07–Civ.–8835(GEL), 2008 WL 5110976, at *5 (S.D.N.Y. Dec. 2, 2008), and citing *McPherson v. New York City Dep't of Educ.,* 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case ... we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what *motivated* the employer...." (emphasis in original) (internal quotation omitted); *Agugliaro v. Brooks Bros., Inc.,* 927 F. Supp. 741, 747 (S.D.N.Y.1996) ("Even assuming defendants were wrong in their belief that plaintiff had engaged in sexual misconduct, what is significant is that they based their decision to dismiss plaintiff on that belief, and not on his age, gender, or pension status.")). Instead, the evidence need only demonstrate that the P.C. had a reasonable, good-faith belief that Plaintiff's skills were lacking, complications were unacceptable, and peer relationships were poor. *See Kolesnikow,* 622 F. Supp. 2d at 111*; see also Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010) ("Only where an employer's business decision is so implausible as to call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual.").

While Plaintiff may believe that the reasons stated by the Surgery JOC and Executive Committee for his termination were wrong, the evidence indicates that they were based on rational, objective evidence indicating that Plaintiff's performance was poor and that his peer relationships were inadequate.  Further, Plaintiff fails to present sufficient evidence that his race, color and/or national origin, or his alleged protected activity, played a role in the P.C.'s decision to terminate his employment.  While Plaintiff

47

may believe that the P.C. treated Dr. McDonald more favorably in terms of supporting their respective practices because McDonald is Caucasian, Plaintiff supplies insufficient evidence upon which to conclude that the P.C.'s decision to terminate him was motivated by his race, color, or national origin, or because the P.C. wanted to retaliation against him.  Accordingly, Defendant is entitled to summary judgment. *See Kolesnikow,* 622 F. Supp. 2d at 111  ("Therefore, in the absence of evidence undermining HVHC's assertion that it believed in good faith that Kolesnikow's conduct merited discipline and termination, or of any other evidence of pretext or discriminatory intent, HVHC is entitled to summary judgment.").

## V.    CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment, ECF No. 45, is **GRANTED**. The Clerk is respectfully directed to entered judgment for Defendant and close the file in this matter.

**IT IS SO ORDERED.**

Thomas J. McAvoy
Senior, U.S. District Judge

Dated:  September 29, 2023

48